IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| DONNA WHITNEY and DESTRY WHITNEY, individually and as parents and heirs of DILLON WHITNEY, deceased,<br><br>                Plaintiffs,<br>vs.<br><br>DEPARTMENT OF JUVENILE JUSTICE SERVICES, a subdivision of the State of Utah; UTAH DEPARTMENT OF HUMAN SERVICES, a subdivision of the State of Utah, STATE OF UTAH; QUEST YOUTH SERVICES, LLC, a Utah corporation; KYLE LANCASTER, DAN MALDONADO, JASON KAUFUSI; HENRY KAUFUSI; and DOES 1-10,<br><br>                Defendants. | MEMORANDUM DECISION AND ORDER<br><br>Case No.  2:09CV30 DAK |

      This matter is before the court on (1) a Motion to Dismiss filed by the State of Utah, the Department of Juvenile Justice Services, and the Utah Department of Human Services (collectively referred to as "the State Defendants"); (2) Plaintiff Donna Whitney and Destry Whitneys's ("Plaintiffs") Motion for Certification to the Utah Supreme Court; and (3) Plaintiffs' Motion for Leave to File Second Amended Complaint.[1]   A hearing was held on August 26,

---

[1] On October 17, 2009, Plaintiff Destry Whitney, Dillon's Whitney's father, filed a Stipulation of Dismissal, dismissing with prejudice his claims against all Defendants.  *See* Docket #73.  The court entered an Order dismissing Mr. Whitney's claims on November 6, 2009. *See* Docket #79.  Therefore, only Donna Whitney's claims remain against the Defendants, although the court will refer to "Plaintiffs" throughout this Memorandum Decision and Order.

2009.  At the hearing, Plaintiffs were represented by Robert D. Strieper.  The State Defendants were represented by Joni J. Jones, and Defendants Quest Youth Services, Jason Kaufusi, and Henry Kaufusi were represented by James C. Lewis.   The court has carefully considered the memoranda and other materials submitted by the parties.  Since taking the matter under advisement, the court has further considered the law and facts relating to this motion.  The court has also considered Plaintiffs' Supplemental Memorandum in Opposition, which was filed on August 28, 2009, and the State Defendants' Opposition to Plaintiff's Supplemental Memorandum, which was filed on September 8, 2009.  Now being fully advised, the court renders the following Memorandum Decision and Order.

## I.  PLAINTIFFS' ALLEGATIONS[2]

Sixteen-year-old Dillon Whitney was charged with several crimes from late 2006 through early 2007.   As a result of Dillon's delinquent conduct, the Honorable Andrew A. Valdez placed Dillon on Probation and within the care and custody of the Department of Juvenile Justice Services ("DJJS") for placement in a wilderness diversion program with Journey Ranch.

On June 5, 2007 Dillon became separated and lost for five hours during an overnight "trek" with Journey Ranch.  Journey Ranch, believing Dillon was an unauthorized leave risk, or an "AWOL risk," recommended that Dillon be removed from Journey to be placed in a more "secure facility" where he could be "under surveillance at all times."  On June 9, 2007 Dillon was removed from Journey and placed in custody at the Salt Lake Valley detention center.

On June 22, 2007, Judge Valdez ordered Dillon, who was still in the care and custody of

---

[2] When deciding a Motion to Dismiss, the court is required to accept as true the allegations in Plaintiffs' Complaint.  The allegations set forth below are merely allegations and may or may not be factually accurate.

2

DJJS, to be followed by DJJS for observation and assessment, with ultimate plans for DJJS to arrange a community-based placement. On August 15, 2007, Judge Valdez, based upon the advice of individuals at DJJS, ordered DJJS to place Dillon in a community-based placement.

On August 15, 2007, DJJS entrusted Jason Kaufusi ("J. Kaufusi") of Quest Youth Services ("Quest") to place Dillon in a safe and secure proctor home and to track Dillon's progress. J. Kaufusi placed Dillon at the "proctor home" of his brother, Proctor Henry Kaufusi ("Proctor H. Kaufusi"). According to Plaintiffs, DJJS's employees lost track and control of Dillon after he was placed in the proctor home. On three separate occasions in early September 2007, a caseworker attempted to contact Dillon, but failed to make contact after being given the excuse by J. Kaufusi that "it is hard to get hold of him [Dillon] after school."

On September 12, 2007, Dillon had a hearing for a joyriding offense. During this hearing, a DJJS representative met with and informed Dillon that he would have a new caseworker "within a month or so." On September 25, 2007 a DJJS representative informed J. Kaufusi that Dillon would be assigned a new caseworker on October 6, 2007. On October 18, 2007, the new caseworker telephoned J. Kaufusi to introduce himself. On October 30, 2007, Dillon learned of his new caseworker when J. Kaufusi arranged the meeting and introduced the two. On November 16, 2007, the new caseworker met with Dillon for a second–and last–time to provide Dillon with his contact information.

During the November 16, 2007 visit, the caseworker decided that Dillon was ready for home visitations and motioned the court to approve them. That same day, Judge Valdez approved the home visits based upon the caseworker's motion. The caseworker informed J. Kaufusi about the order approving home visits, and the caseworker said he would approve the homevisits as long as

Dillon continued to do well in his placement. The caseworker also informed J. Kaufusi that he could make the determination on home visits as long as J. Kaufusi kept the caseworker updated. Subsequently, J. Kaufusi approved a home visit for Thanksgiving Day, November 22, 2007, and Friday, November 23, 2007, until 9:00 P.M.

On Friday, November 23, 2007, Proctor H. Kaufusi twice called his brother, J. Kaufusi, at Quest to inform him that Dillon had not returned home. J. Kaufusi, who was in St. George, Utah for the weekend, made one futile attempt to notify Dillon's dad, Destry Whitney, that Dillon was AWOL and had not returned to the proctor's home. J. Kaufusi also stated that he had left a message on the caseworker's phone telling him that Dillon was AWOL, having not yet returned to the proctor home.

On Saturday, November 24, 2007, an AWOL Dillon and some friends were at the apartment of Victor Hernandez. At some point, Dillon fell down a flight of seventeen stairs at Mr. Hernandez's apartment. Dillon's friends and Mr. Hernandez helped Dillon get back to Mr. Hernandez's apartment and placed Dillon on a couch. The following day, Mr. Hernandez, believing Dillon had died, put Dillon out in the stairwell. On Sunday, November 25, 2007, someone discovered Dillon in the stairwell and called paramedics, who arrived at around 7:00 A.M. Dillon Whitney died en-route to Salt Lake Regional Hospital as a result of blunt force trauma to his head.

According to Plaintiffs, during the time Dillon was missing, no one from the State of Utah, DJJS, or Quest searched for him or reported him missing to any authority who could locate him, as authorized by Utah Law U.C.A. §62A-7-104(10)(a). Also, Plaintiffs claim that the proctor home consisted of a basement and upstairs. Proctor H. Kaufusi and his two children

lived upstairs while the basement was converted to house the proctored children. Dillon was placed in the basement of the proctor home with one other proctored child. Allegedly, Proctor H. Kaufusi allowed the proctored children to come and go at will, and Plaintiffs allege that he allowed the proctored children to violate their respective court orders, the laws of the State of Utah, and the policy and procedures of DJJS.

## II. THE PENDING MOTIONS

In this lawsuit, Plaintiffs have sued Defendants on various negligence theories generally stemming from an alleged breach of their duty to ensure that Dillon was in a secure, controlled environment, and for civil rights violations under a 42 U.S.C. § 1983.

The State Defendants have filed a motion to dismiss the § 1983 claims and the negligence claims against them. Specifically, the State Defendants seek dismissal of the 1983 claims because the State is not a "person" under § 1983. The State Defendants also seek dismissal of the negligence claims against them because, they argue, under the Utah Governmental Immunity Act, immunity is not waived for negligence if the alleged negligence arises out of one's incarceration. Therefore, the State Defendants argue, the "incarceration exception" to the general waiver of immunity for negligence precludes Plaintiffs' negligence claims.

Plaintiffs, however, argue that Dillon was not "incarcerated," and, thus, the incarceration exception does not apply in this case. They also argue that the Utah Governmental Immunity Act is unconstitutional for a variety of reasons. Alternatively, Plaintiffs argue that, to the extent the court finds ambiguity concerning whether the incarceration exception would apply in these circumstances, the court should certify this question to the Utah Supreme Court. Plaintiffs have

also filed a Second Motion for Leave to File a Second Amended Complaint.

### III. DISCUSSION

A. **STATE DEFENDANTS' MOTION TO DISMISS**

    1. **§ 1983 Claims**

The State Defendants first argue that they are not persons for purposes of Section 1983, and therefore, the civil rights claims against them must be dismissed. "Neither the state, nor a governmental entity that is an arm of the state for Eleventh Amendment purposes, nor a state official who acts in his or her official capacity, is a "person" within the meaning of § 1983." *Harris v. Champion*, 51 F.3d 901, 905-06 (10th Cir. 1995). The court agrees, and Plaintiffs do not dispute, that the § 1983 claims against the State Defendants must be dismissed.

    2. **Negligence Claims**

The State Defendants contend that Plaintiffs' negligence claims are barred by the Utah Governmental Immunity Act ("UGIA").[3] Generally, immunity from suit is waived as to any injury proximately caused by a negligent act or omission of an employee committed within the scope of employment. *See* Utah Code Ann. § 63G-7-301(4) (2008). The question presented by the instant motion is whether an exception to the waiver of immunity applies. The State Defendants claim that the "incarceration" exception applies in this case, compelling the dismissal of the negligence claims against them.

The UGIA retains immunity for negligence claims if the injury *"arises out of, in connection with, or results from . . . incarceration of any person in any state prison, county or*

---

[3] There is no dispute that the State Defendants are governmental entities performing governmental functions.

*city jail, or other place of legal confinement" Id.* § 63G-7-301(5)(j) (emphasis added).  State Defendants rely on several Utah cases for the proposition that the incarceration exception applies in this case, barring the negligence claims against them.  In *Epting v. Utah*, 546 P.2d 246, 244 (Utah 1976), for example, plaintiffs sued the State when their mother was killed by an inmate who had escaped from the state prison.  The inmate had escaped from a work-release program when he killed the plaintiffs' mother.  The court held that the placing of a prisoner in a work release program was the exercise of a discretionary function, for which defendants enjoyed immunity.  As to the incarceration exception, the court also observed:

> As to the status of [the inmate] vis-a-vis Defendants' prison, there seems to be just two alternatives, either: (a) he had totally escaped the control of the prison and was thus acting on his own so the prison was not responsible for him; or (b) he was still under the control of the prison authorities so that his conduct would "arise out of the incarceration of any person in (the) state prison . . ." in which latter instance the prison is immune from suit under the statute.

*Id*. at 244; *Kirk v. State*, 784 P.2d 1255 (Utah 1989) (applying the incarceration exception to a situation where a prisoner shot and injured the plaintiff during a court appearance).  The court finds that these cases are distinguishable from the case at bar because the both *Kirk* and *Epting* involved individuals who were sentenced to serve time in prison and were therefore "incarcerated" as that term is commonly understood.

The State Defendants also rely on  *Emery v. State*, 483 P.2d 1296, 1297 (1971), a case in which the Utah Supreme Court found that the incarceration exception barred a negligence claim when the decedent had voluntarily admitted herself to the Utah State Hospital.  While this case is not as easily distinguishable as *Kirk* and *Epting,* a close reading of the court's reasoning reveals

that *Emery*, too, is distinguishable from the instant case.  In *Emery*, the court analyzed the statute pertaining to the state hospital and determined that the state hospital was a place of "legal confinement," even though the decedent had voluntarily requested to be admitted, because a specific provision in the statute that allowed for the possibility of the decedent being held against her will.  *Id.* at 1297.  Specifically, once a voluntary patient requested to be released, the patient was required to wait forty-eight hours to permit sufficient time for the superintendent of the hospital to file a motion with a court to prevent the release.  If a court granted such a motion, there would be no release, and the patient could be confined against his will.  *Id*.  The court determined that a "voluntary" patient was as much confined as was an "involuntary" patient until certain steps were taken to obtain a release.  *Id*. at 1298.  Thus, the court found that the incarceration exception applied in that case.

In this case, Plaintiffs argue that the incarceration exception is inapplicable because Dillon was not incarcerated in a legal place of confinement but was instead placed in a community-based program.  They contend that the situation in this case is more analogous to a foster-care placement than to being "incarcerated."  Then, they argue that Utah courts have repeatedly recognized valid claims against the State for negligent placement of children in foster care.

Having reviewed the case law concerning the incarceration exception to the waiver of governmental immunity for negligence, the case law on negligence claims against the state pertaining to foster-care placement, and the statutory language of the Juvenile Justice Services statute, the court agrees with Plaintiffs that the incarceration exception to the waiver of governmental immunity does not apply in this case.

The Court of Appeals of Utah has stated that to incarcerate "is to imprison or to confine." *Pace v. St. George City Police Dept.* 2006 UT App 494, ¶ 6, 153 P.3d 789, 790. (2006). In setting forth the laws pertaining to Juvenile Justice Services, the Utah legislature set forth that youth offenders are either placed in "confinement in a secure facility *or* supervised in the community." Utah Code Ann. § 62A-7-101(26) (2006 & Supp. 2008) (emphasis added). A "secure facility" means any facility operated by or under contract with the division, that provides 24-hour supervision and confinement for youth offenders committed to the division for custody and rehabilitation. *Id.* § 62A-7-101(20). In contrast, a "community-based program" as defined by the legislature, "means a nonsecure residential or nonresidential program designated to supervise and rehabilitate youth offenders in the least restrictive setting, consistent with public safety, and designated or operated by or under contract with the division." *Id.* § 62A-7-101(3).

Here, the juvenile court judge specifically chose not to confine Dillon to a secure facility but to place him in a community-based program, where he would be supervised and rehabilitated "in the least restrictive setting, consistent with public safety." *Id.* The court cannot conclude that Dillon was "incarcerated" in a place of "legal confinement" for purposes of the Utah Governmental Immunity Act. Therefore, the State Defendants are not entitled to immunity under the incarceration exception to the waiver of governmental immunity for negligence.[4]

**B.  PLAINTIFFS' OTHER MOTIONS**

Plaintiffs have also requested that, if the court does not agree with their position, then the court should certify the issue to the Utah Supreme Court. This request is moot in light of the

---

[4] Because of the court's determination on this issue, the court need not address Plaintiffs' arguments based on the alleged unconstitutionality of the UGIA.

court's determination above.

In addition, Plaintiffs have requested leave to file a Second Amended Complaint, seeking to add two causes of action: Violation of Civil Rights Pursuant to Utah State Constitution Article I Section 7; and (2) they also seek to add the estate of Dillon Whitney as a party.

The court will permit Plaintiffs to add the estate of Dillon Whitney as a party and will also permit Plaintiffs to add their civil rights claim based on the Utah Constitution. The court finds that the Notice of Claim was sufficient to encompass such a claim.

### IV. CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that

(1) The State Defendants' Motion to Dismiss [Docket # 28] is GRANTED in part and DENIED in part. The claims brought against the State Defendants under 42 U.S.C. § 1983 are DISMISSED, but the negligence claims against the State Defendants remain;

(2) Plaintiffs' Motion for Certification to the Utah Supreme Court [Docket #37] is DENIED AS MOOT; and

(3) Plaintiffs' Motion for Leave to File Second Amended Complaint [Docket #44] is GRANTED.

DATED this 25th day of November, 2009.

BY THE COURT:

_____
DALE A. KIMBALL
United States District Judge